IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William M. Reynolds,                           :        Case No. 1:11CV340

              Plaintiff,                     :

             v.                           :        **MEMORANDUM OPINION**
                                                               **AND ORDER**

Commissioner of Social Security,               :

             Defendant.                      :

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423. Pending are the parties' Briefs on the merits (Docket Nos. 10 and 15). For the reasons set forth below, the Commissioner's decision is affirmed.

## I. PROCEDURAL BACKGROUND.

Plaintiff filed an application for DIB on November 18, 2005, alleging that he became unable to work because of his disabling condition on February 2, 2002 (Docket No. 5, pp. 104-106 of 930). Plaintiff filed another application on July 5, 2007, alleging that he became unable to work because of his disabling condition on February 2, 2002 (Docket No. 5, pp. 110-111 of 980). The claims were

denied initially and upon reconsideration (Docket No. 5, pp. 82-84, 85-87, 90-92, 94-96 of 980).

Plaintiff, represented by counsel, and Gene Burkhammer, a Vocational Expert (VE), appeared at a

hearing held on December 7, 2009, before Administrative Law Judge (ALJ) Pamela E. Loesel

(Docket No. 5, pp. 31-65 of 980).   On December 23, 2009, the ALJ rendered an unfavorable

decision, finding that Plaintiff was not disabled (Docket No. 5, pp. 12-25).  On December 21, 2010,

the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final

decision of the Commissioner (Docket No. 5, pp. 5-7 of 980).

### III. FACTUAL BACKGROUND

#### A.  PLAINTIFF'S TESTIMONY AT THE ADMINISTRATIVE HEARING

Plaintiff was 44 years of age, is divorced and has a 16-year-old son. He received Medicaid

benefits to assist with living expenses.   Otherwise, his life partner provided financial support

(Docket No. 5, pp. 39, 45-46 of 980).

Plaintiff's employment history included work as an information technologist, programer,

researcher, and webmaster. From 1989 until 1995, Plaintiff was a biomedical researcher responsible

for running experiments, doing research, maintaining tissue culture cells and maintaining animal

research facilities.

Plaintiff worked for the Veterans Administration and later for a private company developing

tests for abnormal blood types.  Preparing research materials occasionally required Plaintiff to lift

some 5-gallon bottles of water several times daily or a cylinder weighing up to 100 pounds twice

a month (Docket No. 5, pp. 43, 44, 45 of 980).

From 1995 to 1996, Plaintiff worked periodically as a secretary through a temporary agency.

This sedentary occupation involved "mostly  typing " (Docket No. 5, p. 45 of 980).

2

From 1995 to 1998, Plaintiff worked as an information technologist (IT) at a help desk. Sitting most of the time, Plaintiff answered telephones, formed responses to inquiries and performed network administration.  Occasionally,  Plaintiff was required to lift monitors or units that weighed 25 to 30 pounds or walk significant distances to get to computers in the manufacturing plant (Docket No. 5, p. 43).

From 1998 to 2000, Plaintiff was the webmaster and lead programmer at Ontimetraining and Dealer's Group.  There, Plaintiff supervised up to four employees in programming and database administration (Docket No. 5, p. 42 of 980).

From 2000 to 2002, Plaintiff was employed as a lead programer for Graphic Enterprises.  In that capacity, he used web application software to track newspaper pages during various stages of the printing process.  Although Plaintiff sat primarily, he occasionally moved to another computer and lifted computer monitors weighing approximately 25 to 30 pounds (Docket No. 5, pp. 41, 42 of 980).        Six or seven years prior to the hearing, Plaintiff had done "some type of consulting work."  The extent of this work included giving advice (Docket No. 5, pp. 40-41 of 980).

In December 1999, Plaintiff had surgery on his back.  Thereafter, he underwent a series of lysis of adhesions, a process of cutting scar tissue within the body (Docket No. 5, pp. 53, 54 of 980). Plaintiff suggested that the scar tissue in his back interfered with his nerve conduction.  With lower extremity weakness, Plaintiff had experienced episodes of urinary incontinence (Docket No. 5, p. 56 of 980).

Once a month Plaintiff was treated by a pain management physician for symptoms associated with post-laminectomy syndrome, a condition characterized by persistent pain following back surgery, nerve root symptoms and a depressive disorder.  A variety of treatment plans were

3

employed including narcotic medication and muscle relaxers, nerve root blocks and the use of a transcutaneous electrical nerve stimulation (TENS) unit. The medications were marginally effective in controlling his pain. Plaintiff had undergone the final injection in a series of three injections into the nerve root at the end of September and the TENS unit provided some relief when used several times a week (Docket No. 5, pp. 46, 47, 48, 54 of 980; www.ncbi.nlm.nih.gov/pubmed/18335153). Plaintiff continued to have a burning sensation on his right calf, stabbing sensations in his right knee and right ankle, frequent muscle spasms, numbness in his right foot and intermittent weakness in his knee and ankle. These symptoms interfered in Plaintiff's ability to walk, climb stairs, walk ramps or sit for extended periods of time (Docket No. 5, pp. 49, 50, 59 of 980). When his leg was weak or he had to walk long distances, he used a cane or wheelchair (Docket No. 5, p. 58).

In February 2002, Plaintiff was hospitalized for one week after having a panic attack that lasted several weeks. This anxiety disorder was triggered by chronic back pain and work stressors. In March 2009, Plaintiff saw a counselor on a regular basis until he started taking Cymbalta to treat depression and generalized anxiety disorders. Cymbalta proved to be more effective than previous medications. However, Plaintiff continued to have two episodes of depression monthly (Docket No. 5, pp. 51-53 of 980).

Depending on the day, Plaintiff could lift a bag of groceries but he could not lift a 25-pound bag of kitty litter without risking serious injury. Except for the difficulty putting on his socks and tying his shoes, Plaintiff could dress himself most of the time (Docket No. 5, pp. 40, 59 of 980). He performed a variety of general laundry and housekeeping duties including loading and unloading the dishwasher, cleaning the counters and cooking.

Occasionally Plaintiff camped and did some light boating. When camping, he sat and read.

Plaintiff's church activities included singing in the choir which involved a two-hour practice each week and then singing during the one to one and a half hour service.  Plaintiff was permitted to perform sitting or standing (Docket No. 5, pp. 54-57 of 980).

Plaintiff slept between four to eight hours nightly despite intermittent bursts of activity which included muscle cramps or bouts of depression (Docket No. 5, p. 58 of 980).  Nevertheless, Plaintiff arose between seven and eight on the following morning and spent most of the day in a recliner reading or watching television.  Plaintiff denied that he slept at all during the day.  He alternated between doing household chores and taking a respite for up to two hours.  Plaintiff had a driver's license and a handicap placard.  Generally he drove two to three times weekly to the grocery store where he spent a half-hour or less.  The grocery store provided assistance with loading and unloading his grocery cart.  Plaintiff had no difficulty appearing in public (Docket No. 5, pp. 39-40, 58, 60 of 980).

### B. VOCATIONAL EXPERT TESTIMONY.

The ALJ posed a hypothetical question that considered a person of Plaintiff's age, education and past work experience, who could:  (1) occasionally lift ten pounds; (2) frequently lift five pounds; (3) stand and walk two hours of an eight-hour workday provided there is a sit/stand option that facilitated the need to change positions between sitting and standing at intervals not to exceed 30 minutes throughout the course of the day; (4) understand, remember and carry out complex instructions in a work-related setting; (5) occasionally climb ramps and stairs; and (6) occasionally bend, stoop, crouch and crawl.

Consistent with the information found in the DICTIONARY OF OCCUPATIONAL TITLES and its companion publication, SELECTED CHARACTERISTICS OF OCCUPATIONS, this hypothetical person

5

could perform Plaintiff's past relevant work as generally performed in the national economy (Docket

No. 5, p. 62-63 of 980). The VE categorized Plaintiff's past relevant work as follows:

| Job | Physical Exertion Requirements[1] | Skill Requirements[2] | SVP[3] |
|---|---|---|---|
| Help Desk Staff | Sedentary | Skilled as defined at 20 C. F. R. §404.1568(c). | Over two years up to and including four years. Www.occupationalinfo.org/appendxc_1.html |
| Secretary | Sedentary | Semiskilled as defined at 20 C. F. R. §404.1568(b). | Over three months up to an including six months. |
| PC or network coordinator | Sedentary | | Over 2 years up to and including 4 years. |
| Operations Analyst | Sedentary | | Over 2 years up to and including 4 years. |
| Web designer/web programmer | Sedentary | | Over 2 years up to and including 4 years. |

---

[1]

To determine the physical exertion requirements of work in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. These terms have the same meaning as they have in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), published by the Department of Labor. Sedentary work involves primarily sitting, lifting no more than ten pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, and small tools and a certain amount of occasional walking and standing is often necessary in carrying out job duties. 20 C. F. R. § 404.1567(a) (Thomson Reuters 2012).

[2]

In order to evaluate the claimant's skills and to help determine the existence in the national economy of work the claimant is able to do, occupations are classified as unskilled, semi-skilled, and skilled. In classifying these occupations, materials published by the Department of Labor are used.

Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness, close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks. 20 C. F. R. § 404.1568(b)(Thomson Reuters 2012).

Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity. 20 C. F. R. § 404.1568(c) (Thomson Reuters 2012).

[3]

Specific Vocational Preparation, which is usually referred to as SVP by the Social Security Administration, refers to the amount of time required to prepare for a specific type of job. Www.socialsecurity-disability.org/glossary/specific-vocational -training.

The ALJ asked the VE to further assume that in addition to the six limitations listed above, the hypothetical claimant suffered from distractibility secondary to chronic pain, fatigue and various side effects of the medication that resulted in a situation where the hypothetical claimant was unable to interact with the general public no more than occasionally and the hypothetical claimant was afflicted with symptoms including complaints of pain and fatigue of sufficient severity so as to be noticeable to him at all times.  The VE responded that the hypothetical claimant could perform all of Plaintiff's past relevant work except the "help desk" job (Docket No. 5, p. 63 of 980).

In response to counsel's inquiry, the VE explained that if the hypothetical plaintiff was absent for more than two days per month, such absence would be the cut-off for ongoing acceptability by employers.  If the hypothetical plaintiff missed more than three days of work per month,  no work would be available for this worker (Docket No. 5, p. 64 of 980).

## IV.  MEDICAL EVIDENCE.

Medical evidence is the cornerstone for the determination of disability.  The following is a summary of Plaintiff's medical consultations, evaluations and treatments that the ALJ considered in determining disability.

### A.    PHYSICAL IMPAIRMENTS.

The three views of Plaintiff's lumbar spine taken on October 29, 1999, showed a normal lumbosacral spine (Docket No. 5. pp. 547-548 of 980).

Plaintiff presented to Dr. Bradley K. Weiner, M. D., an orthopaedic surgeon, in November 1999 for treatment of L5 nerve root pain and a small punctate foraminal disc herniation at L5-S1. Initially Dr. Weiner employed conservative measures to resolve neuropathic pain.  Such methods failed and Plaintiff underwent a discectomy on December 2, 1999.  For six months Plaintiff's

condition improved.  Eventually Plaintiff fell back into L5 nerve root discomfort (Docket No. 5, p. 190 of 980; www.methodisthealth.com/BradleyWeiner).

Dr. Scott P. Rigby, M. D., an internal medicine specialist, treated Plaintiff for sinusitis on January 4, 2000 and tonsillitis and pharyngitis on March 17, 2000.  On April 17, 2000, Dr. Rigby prescribed a corticosteroid for back pain with sciatica symptoms (Docket No. 5, pp. 458, 459, 461 of 980; www.healthgrades.com/physician/dr-scott-rigby-yhw5c).

In the interim, on January 25, 2000, Dr. Gary Gelesh, D. O., an emergency physician, diagnosed and treated Plaintiff for acute muscle strain of the neck and sinusitis (Docket No. 5, pp. 545-546 of 980).

Dr. Weiner ordered diagnostic testing.  On May 10, 2000, a magnetic resonance imaging of the lumbar spine was administered and on May 26, 2000, and a bone scan emphasizing the lumbar spine was administered.  The results from the magnetic resonance imaging showed focal protrusion involving the right posterior lateral aspect of the L5-S1 disc which appears to at least mildly narrow the right neural foramen while the results from a bone scan emphasizing the lumbar spine was negative for abnormality (Docket No. 5, pp. 207, 209 of 980).

On May 31, 2000, Plaintiff presented to Dr. Rigby with worsening back pain.  Dr. Rigby continued nonsteroidal medication and recommended that Plaintiff resume physical therapy.  On June 6, 2000, Dr. Rigby ordered unlimited physical therapy for ninety days (Docket No. 5, p. 457 of 980).

Dr. Weiner ordered further diagnostic testing.  On June 6, 2000, Dr. Thomas Strachan, M. D., a neurologist, performed an electromyogram to detect abnormal muscle activity in the right and left lower extremities and right lumbosacral paraspinal muscles.  Dr. Stachan concluded that Plaintiff

had mild neuropathic abnormalities in the right lower extremity that were demonstrated in the muscles supplied predominantly by the L5 spinal root (Docket No. 5, p. 204 of 980).

The segmental test of the lower extremity administered on June 12, 2000 showed that both of Plaintiff's legs appeared to have normal arterial flow (Docket No. 5, p. 201 of 980). There was no evidence of arterial occlusive disease (Docket No. 5, p. 202 of 980).

Routine radiological views of Plaintiff's feet taken on July 12, 2000, showed no evidence of fracture or dislocation in the right foot and minimal evidence of degenerative change in the left tarsal region (Docket No. 5, p. 455 of 980).

On July 18, 2000, Dr. John C. DaPos, M. D., administered the first of three epidural steroid injections. He opined that the recurrence of Plaintiff's radicular pain and symptoms were consistent with a foot drop, a neuromuscular disorder that resulted in the weakening of the muscles that allow one to flex the ankle and toes (Docket No. 5, p. 198 of 980; www.mayoclinic.com/health/foot-drop/DS01031).

Plaintiff had only brief relief from a second lumbar epidural steroid injection. Dr. Stephen Hirschfeld, an anesthesiologist, administered the third injection on August 15, 2000 (Docket No. 5, p. 196 of 980; www.vitals.com/doctors/Dr_Stephen_Hirschfeld.html). Because of Plaintiff's low back pain and numbness radiating into his right leg, Dr. Weiner ordered an X-ray examination of Plaintiff's spine. Results from the lumbar myelogram taken on August 23, 2000, were negative for abnormality (Docket No. 5, pp. 192, 197 of 980). The computed tomographic myelogram administered subsequently to the lumbar myelography showed mild eccentric disc bulging versus scarring within the caudal aspect of the right neural foramen at L5-S1 (Docket No. 5, p. 193 of 980).

On October 13, 2000, Dr. Weiner dismissed Plaintiff from the care of his office because he had become demanding regarding narcotic medication.  Dr. Weiner strongly encouraged Plaintiff to re-engage in pain management therapy (Docket No. 5, 190 of 980).

On January 22, 2001, Plaintiff presented to Akron General Medical Center with right flank pain and a swollen toe.  Staff physician Dr. S. Thomas Lloyd, D. O., attributed Plaintiff's flank pain to possible musculoskeletal problems and his swollen toe to gouty arthritis.  Pain medication and prednisone were prescribed (Docket No. 5, pp. 429, 431-432 of 980).

On February 1, 2001, Dr. Aleksey A. Prok, M. D., a pain medicine specialist and anesthesiologist at Cuyahoga Falls General Hospital Pain Management Center, conducted a physical examination and diagnosed Plaintiff with nerve root inflammation and persistent pain and disability following laminectomy (Docket No. 5, p. 189 of 980; DORLAND'S MEDICAL DICTIONARY 347550 (27th ed. 2000); www.vitals.com/doctors/Dr_Aleksey-Prok.html.)

Also on February 1, 2001, Plaintiff consulted with Dr. James Bressi, D.O., a pain medicine specialist.  He diagnosed Plaintiff with lumbar radiculitis and post-laminectomy syndrome and Bressi addressed  Plaintiff's pain resulting from lysis of adhesions on March 15, 2001 and March 22, 2001.  Thereafter, Plaintiff saw Dr. Bressi for fifteen office visits from September 11, 2001, through January 4, 2006.  No evidence of treatment from these dates was presented.  Dr. Bressi specifically addressed unilateral right nerve root syndrome on March 31, 2001, April 11, 2002, April 29, 2003, May 8, 2003 and May 15, 2003.  On September 24, 2002, he administered an intramuscular dose of Depomedrol 80.  He administered a series of three caudal injections on October 1, 2004, October 15, 2004 and October 22, 2004 and again on September 20, 2005, October 4, 2005 and October 20, 2005 (Docket No. 5, pp. 340-343; 345-347 of 980).

10

Dr. Prok administered an epidural lysis of adhesions with a catheter placed under fluoroscopic guidance on March 15, 2001 and March 22, 2001 (Docket No. 5, pp. 356, 367 of 980).

Dr. Rigby, M. D., treated Plaintiff for acute sinusitis on April 12, 2001 (Docket No. 5, p. 451 of 980).

Staff physician John Duldner, M. D., addressed the presence of foreign bodies in Plaintiff's left eye.  Based upon his diagnosis of a corneal abrasion, Dr. Duldner prescribed an antibiotic and Vicodin on October 2, 2001 (Docket No. 5, pp. 526-527 of 980).

Dr. Bressi performed the fluoro guided needle placements on November 15, 2001, November 29, 2001 and January 3, 2002 (Docket No. 5, pp. 353, 354, 355 of 980).

Plaintiff complained of severe diarrhea, dehydration and upper respiratory infection.  The chest X-ray administered on December 5, 2001 showed clear lung fields, no pleural fluid and a clear cardiovascular silhouette (Docket No. 5, p. 449 of 980).

Dr. Bressi ordered an electromyogram and nerve conduction study.  On May 20, 2002, Dr. Lawrence M. Saltis, M. D., a vascular neurologist, determined from the electromyography that there was evidence of mild chronic right L4 root abnormalities of an inactive nature.  Dr. Saltis also interpreted the results from the nerve conduction study which **could** suggest early axonal peripheral neuropathy (Docket No. 5, pp. 347, 349 of 980; www.healthgrades.com/physician/dr-lawrence-saltis).

Dr. Bressi ordered a lumbar spine magnet resonance imaging examination.  On June 13, 2002, Plaintiff underwent a lumbar spine magnetic resonance imaging with and without contrast. Radiologist B. Nelson Essiet concluded that there was no evidence of disc herniation or spinal stenosis; however, it was suspected that there were benign growths in the bodies of T1-2 and L2

11

(Docket No. 5, p. 346 of 980).

Dr. Kevin C. Mineo, M. D, an internal medicine practitioner, treated Plaintiff for an upper respiratory infection on June 30, 2004 (Docket No. 5, pp. 440 of 980).

Dr. Bressi ordered caudal injections for pain management.  Accordingly, Plaintiff underwent a caudal injection on October 22, 2004 (Docket No. 4, p. 345 of 980).

On November 13, 2004, Dr. Kenneth W. Wells, M. D., treated Plaintiff for persistent diarrhea.  On November 17, 2004, Dr. Mineo prescribed an antibiotic to treat the persistent diarrhea as he suspected it was infectious in origin (Docket No. 5, pp. 439 of 980).

On December 6, 2004, Plaintiff presented to the Primary Care Associates of Northeast Ohio complaining of a warm and inflamed left great toe.  Dr. David Fantelli, an internal medicine specialist, diagnosed Plaintiff with acute gouty arthritis (Docket No. 5, p. 438 of 980).

Plaintiff presented to the Akron General Health System on January 10, 2005 complaining of confusion.  Results from various diagnostic tests showed no brain abnormality but elevated white blood counts and mean cell hemoglobin concentration.  Dr. Jack H. Mitstifer, M. D., an emergency medicine physician, concluded that Plaintiff had an altered sensorium after cocaine use (Docket No. 5, pp. 269-272, 282 of 980).

On January 11, 2005, Plaintiff presented to the emergency room after having a panic attack. Dr. Kevin C. Mineo diagnosed Plaintiff with anxiety/panic attack exacerbated by recent cocaine use. Dr. Mineo placed Plaintiff on Librium twice a day for one week to wean him off.  Samples of Effexor were provided to return Plaintiff to the maintenance therapy (Docket No. 5, p. 438 of 980).

Plaintiff was treated on June 2, 2005 for headache and eye discomfort in bright light (Docket No. 5, p. 437; www.nlm.nih.gov/medlinepllus/ency/article/003041.htm).

12

On September 23, 2005 and September 25, 2005, Plaintiff was diagnosed with a gluteal abscess that did not extend into the perirectal region at that time. Initially drug therapy was used to relieve the symptoms (Docket No. 5, pp. 245-259, 261-267 of 980). A month later, the perirectal abscess was incised and drained (Docket No. 5, pp. 497-498 of 980).

On October 4, 2005 and October 20, 2005, Dr. Bressi conducted an image guided injection with fluoroscopy (Docket No. 5, pp. 569, 570 of 980).

Dr. Maureen C. Gallagher, D. O., M. P. H., performed a medical examination on February 21, 2006 and determined that Plaintiff was able to go from a sitting to a standing position and a standing to sitting position without difficulty and lift or carry up to 40 pounds but Plaintiff was unable to be placed on uneven surfaces or in positions that require unrelieved sitting, standing or walking and carrying. Dr. Gallagher opined that the range of motion in Plaintiff's cervical spine, shoulders, elbows, wrists, hands-fingers, left hip and ankles was normal and the range of motion in Plaintiff's dorsolumbar spine, right hip and knees was slightly abnormal. Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees and great toe against maximal resistance and he could raise his feet against minimal/moderate resistance as well as against gravity. Plaintiff had normal use of his hands (Docket No. 5, pp. 371-375 of 980).

On March 10, 2006, a magnetic resonance imaging of Plaintiff's lumbar spine, without and without contrast enhancement, showed relatively mild intervertebral disc and facet degeneration and status post right hemilaminectomy at the L5-S1 (Docket No. 5, p. 487 of 980).

Calcaneal spurring was detected in Plaintiff's right foot on March 20, 2006. Three views of the right foot showed no evidence of acute fracture, dislocation or destructive bony process (Docket No. 5, p. 486 of 930).

13

On April 18, 2006, Dr. Gerald Klyop completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT form wherein he determined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds and climb using a ramp/stair; (2) frequently lift and/or carry twenty-five pounds, balance, stoop, kneel, crouch or crawl; (3) stand and/or walk about six hours in an eight-hour workday; (4) sit about six hours in an eight-hour workday; (5) push and pull on an unlimited basis, other than as shown for lifting and/or carrying; and (6) never climb using a ladder/rope/scaffolds. Dr. Klyop opined that there were no manipulative, visual, communicative or environmental limitations (Docket No. 5, pp. 475-482 of 980).

Matt Dexter, a certified physical therapist, conducted an initial evaluation on October 25, 2006. Mr. Dexter recommended a plan that emphasized the restoration of Plaintiff's spinal extension, stability and strength (Docket No. 5, p. 568 of 980).

On January 18, 2007, Dr. Fantelli incised and drained a rectal abscess (Docket No. 5, p. 577 of 980).

On January 29, 2007, Dr. Thomas Zak conducted a consultative examination and determined that Plaintiff suffered from a non-displaced proximal phalanx fracture of the third toe, back and neck pain and sciatica. Beginning on February 5, 2007 for a period of approximately eighteen months thereafter, Dr. Zak maintained the course of current treatment plan/procedures to control Plaintiff's back and neck pain and tightness. There was some improvement noted on July 11, 2007. However, Plaintiff continued to feel pain (Docket No. 5, pp. 883-928 of 980).

Dr. Emad Daoud, M. D., Ph. D., the medical director for Lutheran Anesthesiology at Cleveland Clinic, administered a caudal epidural steroid injection under fluoroscopic guidance on August 8, 2007; a transforaminal epidural steroid injection at the right L4-5 level on August 22,

14

2007; and a caudal epidural steroid injection using a Navigator catheter on August 29, 2007. Plaintiff reported some improvement in the pain intensity after the second injection (Docket No. 5, pp. 594, 606-607, 611-612, 618-620 of 980).

Dr. Hong Shen, M. D., a physical medicine and rehabilitation physician, conducted an initial evaluation on August 31, 2007.  Dr. Shen ordered an Ameritox screen, a monitor of solutions for chronic pain patients and the physician's practice (Docket No. 5, pp. 602-603; www.ameritox.com).

Dr. Willa Caldwell completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT form on December 6, 2007.  She concluded that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  In addition, Plaintiff could (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk about six hours in an eight-hour workday; (4) sit about six hours in an eight-hour workday; and (5) push and/or pull on an unlimited basis (Docket No. 5, pp. 664-667 of 980).

On February 6, 2008, Plaintiff presented to the Pain Management Center at the Cleveland Clinic with a moderately severe pain level.  Plaintiff reported that with the weakness of his right lower extremity, he had two episodes of urinary incontinence.  Dr. Daoud ordered diagnostic tests and the approval of another series of caudal epidural steroid injections (Docket No. 5, pp. 594-595, 606-607, 611, 614, 618-620, 627-628 of 980).

Dr. Daoud ordered a magnetic imaging resonance examination which was performed on February 27, 2008.  Although there was no significant central canal stenosis,  left lateral/foraminal disc bulging was noted at multiple levels, posterior element hypertrophy at multiple levels and T12 and L2 vertebral lesions.  On March 5, 12, and 19, 2008, Dr. Daoud administered caudal epidural steroid injections (Docket No. 5, pp. 672-688 of 980).

On May 12, 2008, Dr. William Bolz, M. D., completed a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT form and determined that Plaintiff had no communicative, visual or manipulative limitations.  Plaintiff should never climb using a ladder, rope or scaffold and Plaintiff should avoid all exposure to hazards.  Dr. Bolz opined that Plaintiff could (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk about six hours in an eight-hour workday; (4) sit about six hours in an eight-hour workday and (5) push and/or pull on an unlimited basis (Docket No. 5, pp. 728-731 of 980).

On July 3, 2008, Plaintiff had a syncopal episode causing him to fall to the ground without hitting his head.  He was taken by Emergency Medical Squad to the Akron General Health System for treatment.  The attending physician, Dr. Erin L. Simon, D.O. conducted a physical examination, performed a drug screen and reviewed Plaintiff's symptoms and history.  Dr. Simon concluded that the episode was the result of taking new blood pressure medicine, drinking alcohol and exposure to the sun (Docket No. 5, pp. 741-744, 749-752 of 980).

At Dr. Patrick J. McIntyre's request,  magnetic imaging of Plaintiff's lumbar spine was performed on October 23, 2008, the examination was administered.  Although the post-operative changes were present at L5/S1 on the right,  no residual canal stenosis, residual disc herniation or abnormal enhancement were noted, and  the results were within normal limits (Docket No. 5, p. 882 of 980).

Plaintiff consulted Dr. McIntyre on February 10, 2009 to renew his pain medication prescription.  Dr. McIntyre offered Plaintiff another epidural but refused to prescribe any narcotics as Plaintiff was receiving prescriptions from another physician for narcotics (Docket No. 5, p. 818 of 980).

16

On March 11, March 18 and March 27, 2009, Dr. Daoud administered caudal epidural steroid injections (Docket No. 5, pp. 771-776, 777-778 of 980).

On March 26, 2009, Dr. Girgis E. Girgis, D. O., an anesthesiologist, prescribed a transdermal patch used to manage pain and recommended approval for a spinal cord stimulator trial. In the meantime, Dr. Girgis prescribed Oxycodone for pain relief on April 23, 2009, May 21, 2009, July 16, 2009, August 13, 2009, September 1, 2009 and September 20, 2009. Periodically the dosage and frequency of prescription were modified; however, Plaintiff did not report any side effects. In fact, Plaintiff reported some improvement in symptoms during the May and August 2009. During September and October 2009, Dr. Girgis administered caudal epidural steroid injections (Docket No. 5, pp. 954-980 of 980; www.vitals.com/doctors/Dr_Girgis_Girgis.html).

On May 28, 2009, Dr. Roger S. Peckhaman, M. D., read the magnetic imaging of Plaintiff's brain. Plaintiff's pituitary gland was small; however, its signals were normal and there was no evidence of contrast enhancement (Docket No. 5, p. 810 of 980).

On August 5, 2009, after three days of perianal pain, Plaintiff presented to the St. John West Shore Hospital. Under the influence of a general anesthesia, a perirectal abscess was incised and drained (Docket No. 5, pp. 780-789 of 980).

Noting on November 5, 2009 that Plaintiff's blood pressure was elevated, Dr. Girgis continued Plaintiff's prescription for Oxycodone. Dr. Girgis included a prescription for a muscle relaxer (Docket No. 5, pp. 939-944 of 980).

**B.    MENTAL EVALUATIONS AND TREATMENTS.**

On September 4, 2001, Dr. Rigby conducted "micro-counseling" to minimize the adverse effects of a panic disorder. The dosage of medication used to treat depression was increased (Docket

No. 5, p. 450).

On January 27, 2002, Plaintiff had suicidal ideations and his anxiety and depression were slowly increasing due to excessive work stressor and other responsibilities.  In crisis for depression, Plaintiff presented to the Akron General Medical Center for Psychiatry and Behavioral Sciences on January 28, 2002.  In group psychotherapy generally facilitated by Expressive Art Therapist, Nancy L. Nierman, M. A., and supervised by Dr. Maher M. Mansour, a psychiatrist, Plaintiff focused on coping mechanisms to assist with self esteem, depression and anxiety (Docket No. 5, pp. 414-423 of 980; www.vitals.com/doctors/Dr_Maher_Mansour.html).

Dr. Mineo continued prescriptions for medications to relieve anxiety on December 19, 2003 and April 1, 2004.  On April 5, 2004, Dr. Mineo arranged for Plaintiff to treat at the Portage Path Behavioral Health although he was self-pay (Docket No. 5, pp. 440, 441 of 980).  At Portage Path Behavioral Health, Nancy Winkler, a psychiatric nurse, conducted a clinical evaluation on May 6, 2004.  Based on the limited diagnostic information provided by Plaintiff, Ms. Winkler made a preliminary diagnoses of panic disorder without agoraphobia, chronic pain and irritable bowel syndrome and a current global assessment of 61[4] (Docket No. 5, pp. 237-241 of 980).  However, licensed independent social worker, Charles Goold recommended that Plaintiff be discharged from treatment on December 21, 2004 by Plaintiff had attended two sessions and did not call to reschedule.  Furthermore, Plaintiff was referred for a psychiatric evaluation but did not attend (Docket No. 5, p. 242 of 980).

Dr. Mineo opined that Plaintiff's panic attack of January 11, 2005, was exacerbated by recent

---

[4]

The Global Assessment of Functioning (GAF) is a numeric scale used my mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults.  A score of 61 denotes some mild symptoms (ex: depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships

cocaine use. Medication to be taken on a short-term basis for purposes of weaning Plaintiff of these symptoms was prescribed. Samples of medication were dispensed to assist Plaintiff to "get back on maintenance therapy" (Docket No. 5, p. 438 of 980).

In July 2005, Dr. Mineo attributed the sleep disturbances, perioral numbness and electrical type sensations late in the day to being "off" a lot of his medication. Dr. Mineo increased the dosage of medication for depression (Docket No. 5, p. 437 of 980).

Dr. Gary J. Sipps, Ph.D., a psychologist, conducted a clinical interview/mental status examination on February 17, 2006. Based on the information gathered during the interview session, medical evidence and Plaintiff's responses regarding his daily activities, Dr. Sipps concluded that Plaintiff had: (1) a depressive disorder, not otherwise specified in partial remission with medication and panic disorder without agoraphobia in partial remission with medication; (2) an adequate ability to concentrate and attend to task given his performance on the serial three task and his recalling three of three objects; (3) moderate symptoms or moderate difficulty in social, occupational, or school functioning; (4) the capacity for understanding would appear to be adequate and his ability to understand simple instructions as well as comprehend complex material was unimpaired; (5) a low-average capacity for sustained concentration and persistence would appear to be low average given consideration of the presence of indicated disorders; (6) a mildly impaired ability to direct his attention effectively to tasks at hand for a reasonable period of time; and (7) a low-average capacity for adaptation given the degree to which the presence of indicated disorders adversely impacted his ability to deal effectively on a day-to-day basis (Docket No. 5, pp. 562-564 of 980).

On March 22, 2006, Dr. Todd Finnerty completed the PSYCHIATRIC REVIEW TECHNIQUE form and opined that Plaintiff had a major depression disorder and an anxiety disorder although neither

19

precisely satisfied the diagnostic criteria of 12.04 and 12.06 of the Listing.  There were no episodes of decompensation and Plaintiff had a mild degree of limitations in the restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence or pace (Docket No. 5, pp. 462-474 of 980).

On May 29, 2007, a social worker at the Far West Center conducted a mental health assessment and diagnosed Plaintiff with a major depressive disorder.  Plaintiff exhibited some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well (Docket No. 5, pp. 334, 338 of 980).

On August 28, 2007, Dr. Raul Hizon, M. D., conducted a clinical psychiatric evaluation during which he administered clinical tests including serial 7s.  Upon review of Plaintiff's systems, histories and mental status, Dr. Hizon diagnosed Plaintiff with anxiety disorder.  Plaintiff's current anxiety signs and symptoms did not meet the full criteria for a panic disorder (Docket No. 5, p. 332 of 980).

On October 30, 2007, Dr. Deborah Koricke, Ph. D., a clinical psychologist, conducted a clinical interview upon which she based a diagnosis of a dysthymic disorder and a generalized anxiety disorder.  In her opinion, Plaintiff had (1) some serious symptoms or any serious impairment in social, occupational, or school functioning, (2) a mild impairment in the ability to relate to others; (3) a mild impairment in the ability to remember, understand and follow instructions; (4) a mild to moderate impairment in his ability to maintain attention, concentration, persistence and pace; and (5) a mild to moderate impairment given that the nature of Plaintiff's mood would likely inhibit his ability to maintain a pace required in the workplace (Docket No. 5, p. 641 of 980).

Dr. Hizon treated Plaintiff through March 11, 2008 for a mild generalized anxiety disorder

and major depression, in remission.  As treatment progressed, Dr. Hizon concluded that Plaintiff's symptoms adequately responded  as he had less intense panic attacks.  Plaintiff felt substantially improved with panic and mood symptoms (Docket No. 5, pp. 735-737, 762-764 of 980).

Dr. Carl Tishler, Ph. D., completed a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT form and a PSYCHIATRIC REVIEW TECHNIQUE form on December 3, 2007, diagnosing Plaintiff with medically determinable impairments that did not precisely satisfy the diagnostic criteria, namely a dysthymic disorder and generalized anxiety disorder (Docket No. 5, pp. 652, 654 of 980).  As a result of these mental impairments, Plaintiff was moderately limited in his ability to (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (3) perform at a consistent pace without an unreasonable number and length of rest periods (Docket No. 5, pp. 645-646).  The degree of functional limitations resulting from Plaintiff's mental disorders was a mild restriction of activities of daily living and moderate restrictions in difficulties in maintaining social functioning and difficulties maintaining concentration, persistence and pace.  There were no functional limitations resulting from episodes of decompensation, each episode of an extended duration (Docket No. 5, p. 659 of 980).

Mental health therapist, Timothy G. Petrey, Ed. D, LISW, under the supervision of Dr. Kenneth A. DeLuca, Ph. D., prepared a treatment plan on October 28, 2008 to address why Plaintiff was depressed most of the day, showed diminished interest and loss of most pleasures.  Although Plaintiff had serious symptoms or a serious impairment in social, occupational, or school functioning and he was unable to hold a job, the goals of improving his mood, finding pleasure in life, improving energy and exploring all medical avenues to relieve back pain were met on December 6, 2008

(Docket No. 5, pp. 827-837 of 980).

## V. STANDARD FOR ESTABLISHING DISABILITY

Eligibility for DIB or Supplemental Security Income benefits is predicated on the existence of a disability. *Dantzer v. Commissioner of Social Security*, 2011 WL 1113446, *2 (N. D. Ohio 2011) (*citing* 42 U.S.C. § 423(a)).  "Disability" under Social Security is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d) (1)(A) (definition used in DIB context); *see also* 20 C.F.R. § 416.905(a) (definition used in SSI context)). In addition, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . " *Id.* (*citing Walters*, 127 F.3d at 529) (*citing* 42 U.S.C. § 423(d)(2)).

The Commissioner's regulations governing the five-step evaluation of disability for DIB are found at 20 C.F.R. § 404.1520:

1.   Was claimant engaged in a substantial gainful activity?
2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3.   Does the severe impairment meet one of the listed impairments?
4.   Determine the claimant's residual functional capacity and whether claimant can perform past relevant work.
5.   Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

*Id.* at *3.  Only if a claimant satisfies each element of the analysis, including the inability to

22

do other work and the duration requirement, is he determined to be disabled. *Id.* (*citing* 20 C.F.R. § 416.920(4)(i)-(v); *see also Walters*, 127 F.3d at 529). Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Id.* (*citing Walters*, 127 F.3d at 529). The burden shifts to the Commissioner at step five, in determining whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* (*see also Bowen v. Yuckert*, 107 S. Ct. 2287, 165 n. 5 (1987)).

## VI. THE ALJ'S FINDINGS

The ALJ found that Plaintiff met the insured status requirements of the act through December 31, 2007. On December 23, 2009, the ALJ rendered a decision that Plaintiff was not under a disability as defined in the Act at any time from February 2, 2002 through December 31, 2007, the date last insured.

At Step One of the sequential evaluation, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period of his alleged onset date of February 2, 2002, through his date last insured of December 31, 2007.

At Step Two of the sequential evaluation, the ALJ opined that through the date last insured, Plaintiff had severe impairments, namely, post-laminectomy syndrome, anxiety disorder and depression.

At Step Three of the sequential evaluation, the ALJ determined that Plaintiff's impairments were not so severe as to meet or equal the criteria of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

At Step Four of the sequential evaluation, the ALJ found that through the date last insured, Plaintiff has the residual functional capacity to perform sedentary work **except** that Plaintiff (1)

required the ability to change positions between sitting and standing at intervals not to exceed thirty minutes throughout the course of the workday; (2) could only occasionally climb ramps, stairs, bend, stoop, crouch and crawl; (3) could not climb ladders, ropes or scaffolds and (4) could only occasionally interact with the general public due to potential distraction resulting from chronic pain and the side effects of medication.

At Step Five, the ALJ determined that through the date last insured, Plaintiff was capable of performing past relevant work as a web application programmer, help desk customer representative, operations analyst, personal computer and network coordinator and secretary. This work did not require that performance of work-related activities precluded by the Plaintiff's residual functional capacity.

In applying the regulatory five-step approach to evaluating disability, the ALJ denied Plaintiff's application for DIB.

(Docket No. 5, pp. 15-25 of 980).

## VII. STANDARD OF REVIEW

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . " In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

*Shiflet v. Commissioner of Social Security*, 2011 WL 1326284, *1 (N. D. Ohio 2011) (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). The findings of the

24

Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Id.* at * 2. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Id.* (*citing Buxton*, 246 F. 3d at 772).

Accordingly, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his or her decision and if there is substantial evidence in the record to support his or her findings. *Winning v. Commissioner of Social Security*, 661 F. Supp.2d 807, 816 -817 (N. D. Ohio 2009) (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*see Richardson v. Perales*, 91 S. Ct. 1420, 1421 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

A district court must not focus, or base its decision, on a single piece of evidence. *Id.* Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.* An ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). Nevertheless, even if an ALJ's decision is supported by substantial evidence, that decision will not

25

be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IX.  PLAINTIFF'S POSITION.

Generally, Plaintiff seeks an order remanded for a comprehensive review of his physical and mental impairments.  Plaintiff's claims are predicated on four instances in which the ALJ failed to apply the Commissioner's regulations and well-settled case authority.

First, the ALJ failed to give Dr. Bressi's opinions controlling weight or determine the appropriate weight to be given a treating source opinion that does not warrant controlling weight.

Second, the ALJ should have enlisted the assistance of a medical expert.

Third, the ALJ should have discussed whether Plaintiff met or equaled 1.04 of the Listing.

Fourth, Plaintiff met or equaled 12.04 and/or 12.06 of the Listing.

## X.  DEFENDANT'S POSITION

Defendant argues that there was relevant evidence as a reasonable mind might accept to support the ALJ's conclusions.  Accordingly, a reversal is unnecessary.  In the alternative, if the Court finds that a remand is necessary, a remand for further fact finding rather than an award of benefits is appropriate.  Defendant asserts four reasons to affirm the Commissioner's decision.

First, substantial evidence supports the ALJ's residual functional capacity finding that Plaintiff could perform a limited range of sedentary work.

Second, the ALJ properly analyzed the record evidence pertaining to the time period spanning February 2, 2002 through December 31, 2007.

Third, the ALJ properly exercised her discretion in choosing not to supplement the record with further evidence.

26

Fourth, the ALJ properly determined that Plaintiff's impairments did not meet or medically equal a listing.

## XI. DISCUSSION.

1. **ANALYSIS OF DR. BRESSI'S OPINIONS.**

Plaintiff suggests that there are several reasons that Dr. Bressi's opinions are entitled to controlling weight. First, Dr. Bressi treated Plaintiff for a myriad of impairments not covered by his limitations opinion. Second, Dr. Bressi's opinion was based upon limitations that were consistent with Plaintiff's reported and observed activities. Third, Dr. Bressi's opinions were not contradicted by his own treatment notes. Fourth, Dr. Bressi's residual functional capacity determination is both consistent with and supported by his treatment notes. Fifth, Dr. Bressi's opinions were supported by objective testing and various consultative examiners.

Generally, the opinions of treating physicians are given substantial, if not controlling, weight. *Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); 20 C.F.R. § 404.1527(d)(2) (2004)). Treating physicians' opinions are only given such deference when supported by objective medical evidence. *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). Opinions of treating physicians are given great weight even if those opinions are deemed not to be controlling. *White v. Commissioner of Social Security,* 572 F.3d 272, 286 (6th Cir. 2009) (*citing* S.S.R. 96-2p).

ALJs must articulate good reasons for not giving the opinions of a treating physician controlling weight. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations, specifically, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment

27

relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion. 20 C. F. R. § 404.1527(d) (Thomson Reuters 2010).

The ALJ unequivocally determined that Dr. Bressi was a treating source. She arrived at this decision after considering Dr. Bressi's specialty, the length of the relationship with Plaintiff and nature of the treatment provided Plaintiff. In determining what weight to attribute his decisions, the ALJ also considered that once the underlying pathology was revealed, Dr. Bressi's had prescribed pharmacological measures to resolve Plaintiff's chronic pain (Docket No. 5, pp. 340-343; 345-347, 353-355 of 980).

The ALJ further considered that the results from the electromyogram and nerve conduction study ordered by Dr. Bressi were not definitive of a severe impairment (Docket No. 5, pp. 347, 349 of 980). Neither were the results from the lumbar spine magnetic resonance imaging. These tests showed no evidence of disc herniation or spinal stenosis (Docket No. 5, p. 346 of 980). Logically, the ALJ concluded that the extent of Plaintiff's pain could not reasonably be accepted as consistent with the laboratory findings.

The ALJ considered that Dr. Bressi's opinion that Plaintiff's lower back precluded him from any reasonable amount of sitting, repetitive movements of the feet, standing, walking, repeated bending or any type of heavy lifting, was contrary to the opinions of all three consulting physicians, Drs. Gallagher, Klyop and Bolz. Dr. Gallagher opined that Plaintiff could alternate between a sitting to a standing position and a standing to sitting position without difficulty and lift or carry up to 40 pounds (Docket No. 5, pp. 371-375 of 980). Dr. Klyop opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about

six hours in an eight-hour workday; sit about six hours in an eight-hour workday and push and pull on an unlimited basis, other than as shown for lift and/or carry (Docket No. 5, pp. 475-482 of 980). Dr. Bolz found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday and push and/or pull on an unlimited basis (Docket No. 5, pp. 728-731 of 980).

In summary, the ALJ appropriately discounted Dr. Bressi's opinions for the reasons that (1) although he had treated him many times, the nature and extent of the relationship with Plaintiff was limited to repeat injections and drug therapy; (2) his account of Plaintiff's capacity to do work activities was neither in his area of expertise nor based on his own prescriptions for treatment; (3) his opinions regarding Plaintiff's limited capacity to do work activities was the antithesis of results from the laboratory and diagnostic tests that Dr. Bressi ordered; and (4) the severe restriction to functional activities was not consistent with the record as a whole.  Since the ALJ has considered the factors set forth in the Commissioner's Regulations in deciding what weight to give Dr. Bressi's opinions, deference must be given to the ALJ's decision to attribute less weight to Dr. Bressi's opinions.


2.    THE MEDICAL EXPERT.

Plaintiff submits that without the presence of a medical examiner, a full inquiry of the record was not accomplished because the ALJ could not discern functional limitations from Dr. Bressi's treatment notes and therefore could not properly apply the treating rule.

Medical experts are physicians, mental health professionals and other medical professionals

who provide impartial expert opinion at the hearing level on claims under Title II and Title XVI of the Social Security Act by either testifying at a hearing (in person, by telephone, or by video teleconference) or responding in writing to interrogatories. *Turner v. Astrue*, 2011 WL 4436577, *9 (N. D. Ohio 2011). The need for ME opinion is left to the ALJ's discretion. *Id.* (*citing* HALLEX I–2–5–32 (September 28, 2005)). The primary function of an ME is to explain medical terms and the findings in medical reports in more complex cases in terms that the ALJ, who is not a medical professional, may understand. *Id.* (*citing Richardson v. Perales*, 408, 91 S. Ct. 1420, 1430 (1972). The Commissioner's regulations provide that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." *Id.* (*citing* 20 C.F.R. § 404.1527(f)(2)(iii)). The Commissioner's operations manual indicates that it is within the ALJ's discretion whether to seek the assistance of a medical expert. *Id.* (*citing* HALLEX I–2–5–32 (September 28, 2005)). "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind." *Id.* According to the operations manual, an ALJ "may need to obtain an ME's opinion" in the following circumstances:

(1) the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);

(2) the ALJ is determining the usual dosage and effect of drugs and other forms of therapy;

(3) the ALJ is assessing a claimant's failure to follow prescribed treatment;

(4) the ALJ is determining the degree of severity of a claimant's physical or mental impairment;

(5) the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;

(6) the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;

(7) the significance of clinical or laboratory findings in the record is not clear, and the

ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance.

*Id.* (*citing* HALLEX I–2–5–34 (September 28, 2005)).  An ALJ abuses his or her discretion only when the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  *Id.* (*see* 20 C.F.R. § 416.1444; *Haywood v. Sullivan*, 888 F.2d 1463, 1467–1468 (5th Cir. 1989)).

In the instant case, it bears noting that Plaintiff did not articulate or demonstrate by medically clinical and laboratory diagnostic techniques, including Dr. Bressi's medical judgment, that his impairments were the medical equivalence of an impairment in the Listing.  Dr. Bressi's medical opinions provided in this case were not so complex that a medical expert was required to make the medical terms used understandable, to explain about the usual dosage and effect of the drugs prescribed and to explain about the other forms of therapy.  There was no question about whether Plaintiff failed to follow the treatment prescribed by Dr. Bressi.  The evidence provided by Dr. Bressi was conclusive and sufficient to ascertain the degree of severity of Plaintiff's back and neck impairment without the use of a medical expert.

None of the circumstances that require appointment of a medical expert were present in this case.  The ALJ conducted a full inquiry into Plaintiff's allegations and Dr. Bressi's treatment.  The testimony of the medial expert was not required for the ALJ to discharge these duties.  The Magistrate finds that the ALJ did not abuse her discretion in failing to obtain the testimony of a medical expert.

### 3.    1.04 OF THE LISTING.

Plaintiff suggests that the medical evidence of record contained numerous references to severe restrictions in lumbar range of motion, neuropathic abnormalities, reduced blood pressure in

31

the right lower extremity and positive straight leg tests. The ALJ did not consider this evidence in determining whether Plaintiff's impairments met or functionally equaled Listing 1.04.

The Social Security Administration has developed rules called the Listing of Impairments for common impairments. The Listing describes the degree of severity that the Social Security Administration presumes would prevent a person from engaging in substantial gainful activity. *See Johnson v. Secretary of Social Security,* 794 F. 2d 1106, 1113-1114 (6th Cir. 1986). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *May v. Astrue*, 2011 WL 3490186, *7 (N. D. Ohio 2011) (*citing* 20 C.F.R. §§ 404.1525(c)(3)). A claimant must satisfy all of the criteria to "meet" the listing. *Id*. (*citing Rabbers v. Commissioner of Social Security*, 582 F.3d 647, 652 (6th Cir. 2009)).

The listing for an impairment of the musculoskeletal system is found at 20 C. F. R. Pt. 404, Subpt. P, App. 1, 1.00. In particular, disorders of the spine are found at Listing 1.04. Specifically, under Listing 1.04, disorders of the spine, namely, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord are recognized. However, these listed impairments must coexist with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness,

and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Without articulating the reasons, the ALJ found at Step three of the sequential evaluation process that Plaintiff's impairment did not have an impairment or combination of impairments that met or medically equaled Listing 1.04 (Docket No. 5, p. 17 of 980). The medical evidence of Plaintiff's impairments did not demonstrate listing level severity. There were no physical manifestations of nerve root compression. There are no operative notes, pathology reports or other acceptable imaging of an inflamed arachnoid. Neither was there acceptable imaging of lumbar spinal stenosis resulting in pseudoclaudication (Docket No. 5, pp. 189-195, 204-207, 209, 211-212, 214-217, 221, 227, 229-234, 344-349. 353-356, 367-368, 373-374, 379-380, 429, 435-436, 457-458, 487, 535-536, 540, 542, 547, 548, 569, 573-574, 594-595, 606-607, 611, 614, 619-620, 627-628, 629-631, 672, 677, 682, 687-688, 701-702, 706, 771-776, 777-778, 929, 930, 932, 933, 936-980). In sum, there are no specific medical findings that meet or equal those of any impairment in 1.04 of the Listing of Impairments. Even if the ALJ erred by failing to provide an explanation, this error does not dictate reversal or remand. The ALJ clearly considered the absence of medically documented evidence in determining that Plaintiff's impairments did not meet any of the threshold requirements for any of the impairments set forth in Listing 1.04.

### 4. LISTING 12.04.

Plaintiff contends that the ALJ erred in not properly analyzing whether he met a mental health listing when he failed to address the A paragraph requirements of either Listing 12.04. In both cases, the ALJ ignored Plaintiff's hospitalization for a full week, his frequent panic attacks that lasted a full week and his deficiencies of concentration, persistence or pace resulting from his inability to complete tasks in a timely manner.

Listing 12.04 provides:

12.04 Affective Disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:
    1.    Depressive syndrome characterized by at least four of the following:
        a.    Anhedonia or pervasive loss of interest in almost all activities; or
        b.    Appetite disturbance with change in weight; or
        c.    Sleep disturbance; or
        d.    Psychomotor agitation or retardation; or
        e.    Decreased energy; or
        f.    Feelings of guilt or worthlessness; or
        g.    Difficulty concentrating or thinking; or
        h.    Thoughts of suicide; or
        i.    Hallucinations, delusions or paranoid thinking; or
    2.    Manic syndrome characterized by at least three of the following:
        a.    Hyperactivity; or
        b.    Pressure of speech; or
        c.    Flight of ideas; or
        d.    Inflated self-esteem; or
        e.    Decreased need for sleep; or
        f.    Easy distractibility; or
        g.    Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h.    Hallucinations, delusions or paranoid thinking; or
    3.    Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); and

B.    Resulting in at least two of the following:

    1.    Marked restriction of activities of daily living; or
    2.    Marked difficulties in maintaining social functioning; or
    3.    Marked difficulties in maintaining concentration, persistence, or pace; or expending
    4.    Repeated episodes of decompensation, each of extended duration; or

C.    Medically documented history of a chronic affective disorder of at least two years'

duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.   Repeated episodes of decompensation, each of extended duration[5]; or
2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.   Current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 (Thompson Reuters 2011).

Listing 12.04 is satisfied when both "A **and** B" are satisfied, or when the requirements in "C" are satisfied. Since the Plaintiff did not satisfy the "B" or "C" criteria, a discussion of whether Plaintiff met the severity of the "A" criteria was unnecessary. Even if Plaintiff experienced repeated episodes of decompensation as he suggested, Plaintiff was unable to provide sufficient evidence that demonstrated the presence of marked restrictions of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace. In fact the evidence presented would have led the ALJ to draw a different conclusion.

Dr. Sipps concluded that Plaintiff had an **adequate** ability to concentrate and attend to tasks and **low average** ability for concentration and persistence and a **mild** impairment in his ability to direct his attention effectively to tasks at hand for a reasonable period of time (Docket No. 5, pp. 562-564 of 980). Dr. Todd Finnerty opined that there were no episodes of decompensation and Plaintiff had a **mild** degree of limitations in the restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence or pace (Docket No.

---

[5]

The term *repeated episodes of decompensation, each of extended duration*, in the listings means three episodes within one year or an average of once every four months, each lasting for at least two weeks. 20 C. F. R. Pt. 404, Subpt. B, App. 1, 12.00 C 4 (Thomson Reuters 2012).

5, pp. 462-474 of 980).  The social worker at the Far West Center explained that Plaintiff exhibited some **mild** symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well (Docket No. 5, pp. 334, 338 of 980).  Dr. Hizon determined that Plaintiff's generalized anxiety disorder was **mild** and the symptoms of major depression were in remission (Docket No. 5, pp. 735-737, 762-764 of 980).  Dr. Koricke opined that had a **mild** impairment in the ability to relate to others; a **mild** impairment in the ability to remember, understand and follow instructions; and a **mild to moderate** impairment in his ability to maintain attention, concentration, persistence and pace (Docket No. 5, p. 641 of 980).  Dr. Tishler determined that Plaintiff was **moderately** limited in his ability to maintain attention and concentration for extended periods and **moderate** restrictions in difficulties in maintaining social functioning and difficulties maintaining concentration, persistence and pace (Docket No. 5, p. 659 of 980).

Under the "C" criteria, Plaintiff was unable to show a medically documented history of chronic affective disorder of two years' duration.  Neither do Plaintiff's medical records confirm his testimony that he continued to have panic attacks twice monthly.  In September 2001, Dr. Rigby conducted "micro-counseling" to minimize the adverse effects of a panic disorder.  Plaintiff testified that in February 2002, he was hospitalized for one week after having a panic attack that lasted several weeks.  The evidence shows that Plaintiff presented to the emergency room in January 2005 with a panic attack.  This evidence does not show that Plaintiff suffered from three episodes of panic attacks within one year or an average of once every four months, each lasting for at least two weeks.

The Magistrate does not find that the ALJ committed reversible error by failing to discuss the attributes of the "A" criteria since, in this case, there is no medical determination that Plaintiff can satisfy two of the "B" criteria.  Without the coexistence of two marked restrictions prescribed

36

the "B" criteria or the presence of a medically documented history of chronic affective disorder of

two years' duration, there could be no finding that Plaintiff met or equaled Listing 12.04.

     **5.**     **Listing 12.06.**

     Similarly Plaintiff argues that the ALJ erred in not properly analyzing whether he met a

mental health listing when he failed to address the A paragraph requirements of Listing 12.06.

     12.06 Anxiety Related Disorders:  In these disorders, anxiety is either the predominant
disturbance or it is experienced if the individual attempts to master symptoms; for example,
confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or
compulsions in obsessive compulsive disorders.

     The required level of severity for these disorders is met when the requirements in both A and
B are satisfied, or when the requirements in both A and C are satisfied.

     A.     Medically documented findings of at least one of the following:

          1.     Generalized persistent anxiety accompanied by three out of four of the
following signs or symptoms:
              a.     Motor tension (e.g., shakiness, jitteriness, jumpiness, trembling,
tension, muscle aches, fatigue, inability to relax, eyelid twitch,
furrowed brow, strained face, fidgeting, restlessness, easy startle;
Dmh.mo.gov/docs/mentalillness/anxietydisorder.pdf); or
              b.     Autonomic hyperactivity (symptoms can range from hallucinations
to heart palpitations to phobic thinking and it can often feel like an
anxiety attack; www.autonomic.hyperactivity.html) or
              c.     Apprehensive expectation (persistent thoughts of potential
misfortune, anxiety, worry and fear); or
              d.     Vigilance and scanning (constantly on the alert for danger, failure or
disaster;  Www.nativeremedies.com/ebooks/PDF/anxiety-
ebooklet.pdf.); or

          2.     A persistent irrational fear of a specific object, activity, or situation which
results in a compelling desire to avoid the dreaded object, activity, or
situation; or
          3.     Recurrent severe panic attacks manifested by a sudden unpredictable onset
of intense apprehension, fear, terror and sense of impending doom occurring
on the average of at least once a week; or
          4.     Recurrent obsessions or compulsions which are a source of marked distress;
or
          5.     Recurrent and intrusive recollections of a traumatic experience, which are a

source of marked distress; and

B.      Resulting in at least two of the following:

      1.      Marked restriction of activities of daily living; or
      2.      Marked difficulties in maintaining social functioning; or
      3.      Marked difficulties in maintaining concentration, persistence, or pace; or
      4.      Repeated episodes of decompensation, each of extended duration. Or

C.      Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06 (Thomson Reuters 2012).

For the same reasons as discussed in analyzing Listing 12.04 above, Plaintiff is unable to show that he had marked limitations in at least two of the "B" criteria.  Presuming but not finding that Plaintiff experienced repeated episodes of decompensation as he suggested, the Magistrate reiterates that Plaintiff was unable to provide sufficient evidence that demonstrated the presence of marked restrictions of activities of daily living; and/or marked difficulties in maintaining social functioning; and/or marked difficulties in maintaining concentration, persistence, or pace.

Under the circumstances in the instant case, the ALJ did not err in failing to discuss the "A" criteria because Plaintiff could not show that he complied with at least two of the "B" criteria. Plaintiff has also not demonstrated that his anxiety related impairments have resulted in complete inability to function independently outside the area of his home.  Clearly Plaintiff's impairments do not meet or equaled the severity of impairments in 12.06 of the Listing.


## XII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

38

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   February 22, 2012